minors versus Illinois Department of Children and Family Services. We have Jan Cuse and Kevin Sweeney for the APLEES, and I see you've divided your time. And we have Norma Miner and Teresa Macciato for the APLEES, and you also have decided on a time division, and you may proceed when you are prepared to. Good morning, Your Honors. For the record, my name is Jan Cuse, Assistant Attorney General for DCFS. Sorry. That's all right. I know that you're familiar with the facts of this case that was filed as a 306-A-5 PLA. The court granted the PLA on April 21st. I noticed in my hotel room this morning, looking back at my appendix, that I did not include that order in my brief. I included an interim order for it. I apologize for that. Just briefly, this case involves two minors who are half-sisters. In March of 2008, the circuit court found that they were neglected minors based on an injurious environment. In April of 2008, the court entered into dispositional order, gave DCFS guardianship and custody at that time. In March of 2010, the Lozorczaks, who are related to K.D., but not A.D., filed a motion for custody and guardianship of K.D. In July of 2010, Jane Conte, who is a friend of the family, of the biological mother and the girls, filed a similar motion for custody and guardianship of A.D. In February 1st, 2011, the court granted the motion partially. The court gave custody to the private parties, but decided to retain the guardianship of DCFS. We contend that this was an error, and because of that, we filed our PLA. Your Honors, under the Juvenile Court Act, a circuit court's authority to proceed is limited. The court's jurisdiction, of course, is constitutional. But courts, even as recent as 2008 in the E.B. case, the Supreme Court recognized that when the Juvenile Court Act is involved, the circuit court's authority to act is based strictly on the language of the act. So although the circuit court has jurisdiction to proceed, its authority is limited. Sections 2-23 and 2-28 of the Juvenile Court Act make it clear that when DCFS is the guardian, a court cannot order a specific placement. Yet that is exactly what happened here. Because of that, the court erred by overreaching of statutory authority. Now, appellate courts, including the TLC Court in the 4th District, have recognized that in certain situations, custody and guardianship can be split. But when DCFS is the guardian, custody and guardianship cannot be split. That was echoed in the case of R.M. and also in M.D. When the guardian, Elida, responded to the motions for custody and guardianship, she said that DCFS could be retained as the guardian because that had been done in other cases. She cited nothing for that proposition and she filed a brief on appeal. And perhaps she was referring to private guardianship cases. But the case law is very clear, as is the statute, that custody and guardianship cannot be split when DCFS is the guardian. And certainly there are many reasons that the legislature chose that. When DCFS is the guardian and someone else has custody and placement, that the court has decided, DCFS loses some of its broad powers over the child. If DCFS finds that there are problems with the custodian, DCFS can't, as it would in a foster home, simply take that child out of the home. When someone else is the custodian, legal custodian, DCFS would have to go back to court to make any changes in that arrangement. And as this court may be aware, DCFS did file a motion to modify the dispositional order. It was later withdrawn. But I think that this shows the kind of problems that arise when DCFS's expertise and powers are limited by a certain court's actions, such as this one. And the TLC case, I think, put it best when it acknowledged DCFS's expertise and knowledge. Expertise, I think, in a large general sense, and knowledge in a day-to-day sense of what's going on with the minor. The court acknowledged DCFS's expertise, but said that that is subject to the court's power to approve of certain decisions that DCFS makes. So the arrangement respects DCFS's authority and expertise. But that is not what was done here. And we would ask the court to reverse or vacate that order. Along with the issue of the guardianship and custody, the circuit court also ordered Luke and Social Services, which was an agency that DCFS contracted with to provide services. The court ordered that LSSI be removed from the case. The court had the authority to do that. The court went further, however, and ordered that DCFS provide the services directly. And again, under Section 2-23 and 2-28 of the Juvenile Court Act, a court has no authority to decide particular service providers. Yet this is precisely what the circuit court did here. The circuit court cited no authority for its decision on either of these counts. And we would argue that the plain language of the Juvenile Court Act prohibits it. And case law from other circuits and other districts of the appellate court have exactly held that this cannot be done. DCFS, as the guardian, has many responsibilities for the well-being of the children. And when someone else has the legal custody of the child, it undermines DCFS's authority to provide the best interest of the child. If the court doesn't have any questions, that's all that we have. We would ask that the court reverse that order. Thank you, Ms. Hughes. You'll have the opportunity for rebuttal. Mr. Sweeney, you're up first. Well, I've been handling child neglect cases since 1972, and this is the single weirdest appeal I've ever seen in any such case. It's weird, because none of the orders which are under appeal are currently in effect, except for one order, which DCFS is now enthusiastically approving in the trial court. Now, with respect to Caliana, one of the two girls, DCFS in the trial court is now actively trying to promote adoption of Caliana by Stephen and Madeline Lesorchek. And indeed, they've even discussed paying Stephen and Madeline Lesorchek to adopt Caliana in the form of a subsidized adoption. Well, here on appeal, they're asking this court to vacate the order placing Caliana with Stephen and Madeline Lesorchek. You know, that's not litigation. That's lunacy. Is that a divorce record? It is part of a verified motion to dismiss the appeal as moved and then filed. That motion was denied by this court, but the additional facts have come to light since then, which have made that motion a lot more valid and relevant. Their case is cited in my brief and in my motion to say this court will properly take additional notice of facts when the appeal is moved. So, you know, DCFS is completely contradicting itself. They're saying the Lesorcheks adopt this girl and saying this court vacated the order placing the girl with the Lesorcheks. I've never seen anything like that before. Now, with respect to Anadia, they're appealing an order placing Anadia in the custody of Jane Conte. But Anadia is not now presently in the custody of Jane Conte. This is the additional fact that I mentioned which adds to the mootness and, indeed, the general stupidity of this appeal. Anadia is now in a residential treatment center in Addison, Illinois. Now, furthermore, care of Anadia, the residential treatment center, is being supervised by Lutheran Child and Family Services, not LSI. It's a different agency. And so DCFS is appealing an order saying that they can't allow a contracting agency to supervise care of a girl. But right now they're allowing a contracting agency to supervise care of the girl and no one, including the judge, is objecting to it. So, they're appealing from one order, which in the trial court they're refusing to ask, they're trying to enforce. They're appealing from another order, which is not currently in effect because Jane Conte doesn't have physical custody of Anadia right now. And they're appealing the order prohibiting them from allowing a contracting agency to supervise care of the girls when, in fact, they're being allowed right now to have a contracting agency supervise the care of the girls. I mean, I just don't understand this. I just don't understand how you can appeal from an order which is either no longer in effect or which you're enthusiastically endorsing at the trial court level. So, for these reasons, I renew my request that this appeal be dismissed as moot or, on the alternative of this court, vacate discretionary mutual appeals involved with the grant. Now, Ms. Hughes said something in her argument, which is definitely not true and directly contrary to the precedent, which is that a juvenile court judge has authority over a guardian only specifically granted in the Juvenile Court Act. And I've cited cases in my brief as head of co-counsel for the other at-large, which state that an ill-known court has the inherent power to appoint and rip a guardian from minor and to regulate the conduct of that guardian. Casey, Lawrence M., Ryan, Sempak, and Smythe in the MR case is all say that. So, the question is not whether the Juvenile Court Act grants specific authority to the judge to order a child placed for adoption. The question is whether it prohibits the judge from doing that. And it doesn't. It doesn't prohibit it. On the contrary, there's numerous clauses in the Juvenile Court Act which indicate strongly that a judge has the power to order a child placed for adoption. The purpose and policy section specifically says that DCFS shall plan for permanency at the earliest possible opportunity. Of course, it's not possible to return the child to the parent. Well, DCFS, or rather its contracting agency, could be violating that statutory duty in this case by allowing these girls to stay in placement for three years without planning for adoption. And unless that language is meaningless, the judge has the power to enforce it. Furthermore, the judge has the power to set the permanency goal of substitute care pending termination of parental rights, and after parental rights are terminated, set the permanency goal of adoption. Unless that statutory language means nothing, then the judge has the power to order the child placed for adoption. Unless permanency hearings mean nothing, unless purpose and policy means nothing, unless the power of the judge to order adoption means nothing, then the judge has the power to order a child placed in an adoptive home. Now, DCFS relies on language in the statute which is presented to you only in highly edited form which distorts its meaning. They quote language in the Juvenile Court Act which says that the judge doesn't have the power to order specific placements, but they carefully edit out the language which limits that provision. Actually, the statutory language says that the court is not empowered by subsection 2 or under subsection 3 to order specific placements. So that language doesn't prohibit a judge from ordering a child placed for adoption. It simply indicates that certain statutory provisions do not in and of themselves give the power to place for adoption. But other statutory provisions do give that power, specifically the power to terminate parental rights and set adoption as the permanency goal. Now, the cases cited by DCFS which it cites for the proposition that a judge doesn't have the power to order specific placements, none of them involve adoption. The R.M. case has been effectively overruled, as it said, because it said that the judge doesn't have the power to order a child removed from a specific home. That's no longer the law as DCFS concedes. The M.B. case said that a dispositional hearing does not give the judge the power to order placement in a specific foster home. And the TLC case likewise says that placement in a specific foster home is not an authorized disposition at a dispositional hearing after finding neglect. But that's not what we're talking about here. We're not talking about a dispositional hearing. We're talking about years later when the judge has set adoption as the permanency goal. And that power is meaningless. That statutory power is meaningless without the power to order a child placed for adoption. Now, with respect to the contracting agency issue, it's completely eroded. The DCFS never asked the judge to make up that order, never objected to entry of that order, and furthermore, has no standing to appeal for a couple of reasons. One, it's never requested permission from the court to allow a contracting agency to supervise placement of the child. And two, it was actually assigned a contracting agency to supervise care of Anadia B. without any objections from anyone. There's no dispute for this court to resolve. Gloria Amaya, who's here today, who determined that the best interest of these children required placement with the Zorchaks and Conte, never tried to prevent DCFS from letting a contracting agency supervise care of the girls. The judge has never been asked permission to allow a contracting agency to supervise placement and care of the girls. The care of one girl is being supervised by a contracting agency and nobody's objecting. There's no dispute for this court to resolve. Now, you know, I've argued some fairly technical legal issues here, but this is not a technical case. It's a case involving the future and life of two little girls who were betrayed by the contracting agency. For three years, they were in placement. The statute required that DCFS plan for the adoption of these girls, as it was clear that they were never going back to their parents. And the contracting agency never fulfilled that duty. Doesn't the court have power to make DCFS available to the law? Doesn't this court have the power to take into consideration the welfare and future of these girls? And DCFS concedes that they belong with the Zorchaks. In the case of Callahan and Dee, in the case of Nadia Bee, the issue of the case of Moot, because the child has been wandering the physical custody of Jane Conte. Imagine you're a juvenile court judge, and some bureaucratic slip-up, some kid is in placement for years, his family needs adoption, is required by the Juvenile Court Act to be adopted. And the agency won't do it. Don't you have the power to make the agency obey the law? That's all the judge did here, and that's all that we're asking the court to approve if it even chooses to hear this case. Make the DCFS and its contracting agencies obey the law. Back up the judge when it made them do that. Protect the future of these girls. For these reasons, we ask that this case be dismissed as Moot, or that the case will still be vacated, or that the order of the trial judge be affirmed. Thank you, Mr. Sweeney. Ms. Miner, you have five minutes. May it please the court, I'm Noah Miner, and I represent Madeline and Stephen Zorchak, the great aunt and uncle of Callahan. As for the issue on the authority to modify custody, DCFS has consistently maintained that once the court appointed the DCFS as a guardian, the court lost all of its power. The court can't make any decision to modify that custody or change that at all. That position renders several statutes in the Juvenile Court Act superfluous. A good example, 705 ILCS 4052-28-4, clearly states the miner or any person interested in the miner may petition the court for a change of custody or guardianship, and it's or, not and. 705 ILCS 4052-27 says the court at the placement hearing for any later days may appoint a guardian or place the children with a suitable relative as the custodian or guardian. Case cited by the Department of Maternal and Family Services, NREA-MN. The way I read that case, it says the Illinois Supreme Court held that the circuit courts of this state have an inherent plenary power to appoint guardians of minors independent of any statutory authority given to them, been given to the courts by the legislators. It is the authority to empower the guardian to consent to adoption that is exclusively from statutes. In fact, in this case, the court was not in a position and should not have appointed the guardianship with consent to adoption to the department because that's very limited. Either the parents are living, it has to be with the parents' consent, or the parents have to be found unfed and their rights terminated. That's not the case here. Neither parent consented to the department having the right to adoption, to consent to adoption. Neither one consented to that. Neither one of those rights had been terminated. The mother had been found unfed, but no best interest hearing had been had. So her rights were not terminated. The father has never been. His rights have never been terminated. He's never been found unfed. So the court, by statute, by the case law, the court did have the power in this case to modify that custody or guardianship, either one. It doesn't say custody and, it's custody or. The statute also says, 705 ILCS 405 1-3813, that guardianship is subject to the residual rights of the parents. The residual rights of the parents is to consent to adoption. So they shouldn't have the right to consent to adoption. That's the issue on the DCFS, the service ordering the Lutheran Social Services off the case, and the DCFS to make the service plan. Under 705 ILCS 405 2-27-C and D, had the court ordered the department to keep Lutheran Social Services on the case, it would have been an error. Because under C of that statute, the court does not have the authority to appoint or to commit the children to an agency that is either under the DOC's authority or the Department of Children and Family Services authority. However, under D of that statute, the court may commit minors to DCFS for care and services. That is what happened here. Both the DCFS and Lutheran Social Services were originally found in contempt of court. They totally just disobeyed court orders. More than once they disobeyed court orders. So Lutheran Social Services had abused their authority all over the place in this case, ignored the court totally, the court had every reason to remove Lutheran Social Services from this case, did not mandate the department could not select another contract agency. The department has decided on their own to maintain the case and they have not appointed another contract agency. Thank you. Thank you, Ms. Minor. Ms. Munchekow-Hopkins, you also have been designated five minutes. Your Honors, I'm Theresa Munchekow-Hopkins. I represent Jane Conte in this case. The reality of how juvenile court works in Williamson County is we have several cases that are set on Thursdays. The majority of them are permanency hearings, the hearings that we have to have every six months in order to see where the child is at and so that the contracting agency or DCFS can get their additional funding for the next six months or pay for the last six months. The reality of the situation is we have to rely very heavily on the case workers. A lot of times we do not receive reports until the day of the hearing or two days before the hearing. Those of us that are involved in the juvenile court system have to make very quick decisions and set out the next goals for the next six months for children. For several years, what was going on in this case is that the guardian ad litem in the state of Illinois, they were having to rely on incorrect information that they were receiving from the case worker from Lutheran Social Services. In 2009, Jane Conte was, the mother gave, signed an adoption consent for Jane Conte to adopt the child. Jane Conte then intervened in the juvenile case. Jane Conte then filed a petition to modify a, or not to modify a dispositional order. She filed a petition for custody. The state's DCFS's contention is that we were trying to modify a dispositional order. We were not trying to modify a dispositional order. This position had happened on April 11th of 2008. We were trying to have the order changed for the next permanency to have custody and guardianship awarded to Jane Conte. Now, Judge Moore entered an order giving custody to Jane Conte, guardianship to the department. This happens a lot in Williamson County for very specific reasons. Sometimes children are able to go home with their parents, but the case needs to remain open for a period of time so that the family can continue to receive services. Oftentimes they have Mormon funds that they're going to get so that the parents can get housing. There's additional mental health counseling. Sometimes the children are in counseling. The parents can't afford it. The case remains in the guardianship of the department simply to keep services going. A lot of times the contracting agency as long ago as two weeks ago came to the state, the guardian ad litem, and requested that custody be with the parents. Guardianship be retained by the department, which point I think the guardian ad litem said you're on appeal on this issue. I don't think we'll do that today. But logistically, that's why it happens. And there's an appellate court case that I did cite in my brief, which is exactly what happened in the case of N. Ray MP where the mother was given custody. The department retained guardianship. The mother appealed saying that I'm ready to have custody and guardianship returned to me. And the court upheld that splitting of the custody and guardianship, saying further this court has previously recognized the propriety of such a division. Section 1-38C of the Act states that guardianship of the person of the minor includes the rights and responsibilities of legal custody except where legal custody has been vested in another person or agency. This, Section 1-3 of the Act contemplates that a trial court may divide guardianship and custody of the minor. So when the department is okay with it, where they're saying we want to stay involved in this case, but it's okay for the child to go home with the parents and custody to be returned, they're okay with that. Also, if you look at just the plain reading of the statutes, I feel that the definition statutes indicate that the legislature contemplated that there would be times where one would have guardianship and the other would have custody. With regards to, oh, one other thing. When you look at the record, it's huge. This was a 16-day trial. We started on August 19, 2010, and we concluded on January 11, 2011. We had 16 days where Judge Moore heard what was in the best interest of Anadia and Callie, and that's why he made the decision that he did, that Jane should have custody of Anadia. Now, Anadia is presently in a residential facility with the Department of Justice. She had a misdiagnosis for three years with Lutheran Social Services and the counseling services that this child received. You can look in the record and you can see that her counselor was oftentimes looking at tracking Anadia's behaviors with the moon. That's who they had Anadia with. Now, with the other part of the case, I would ask that the court determine that the court was within its authority to remove Lutheran Social Services and place DCFS in control of this case. DCFS has not requested a modification to be removed from this case. They are, quite honestly, doing a very good job presently now that DCFS is monitoring this case. Thank you, Ms. Machikow. Ms. Hughes, you have rebuttal time. First, I just want to assure this court that if it reverses the circuit court's decision, it doesn't mean that DCFS will act against the best interest of these two girls. DCFS, its whole purpose in this case is to promote their best interest, not act against it. And if the court reverses, I think at that point, DCFS will reassess the current facts of the case and determine what to do. There was, I think, mentioned in the state's brief especially that this is going to disrupt the children. They will be sent back to their former foster parents. We have never said that that would happen. DCFS, if there is reversal, would determine at that point how to proceed with both children and both of their needs. I also want to talk about, I think that Mr. Sweeney raised some mootness questions that he raised in the motion to dismiss this appeal, which this court denied because DCFS's objections were well taken. There is no mootness to this case. DCFS is still the guardian of these children. That has not changed. We put forth in our brief, I know that you're on a 150-day schedule for the decision and that's coming up, but before that time, if there are facts that make this case moot as to either of these girls, we would ask this court to go ahead and decide these important issues on the public interest exception to mootness. This case falls directly into that. The public interest exception requires it be a question of public interest, that there's a need for authoritative determination for public officials and that would include both DCFS and the court and the likelihood of future recurrence. If the GAL believes that this is a proper order, that this has been done many times before, then obviously there's likelihood of future recurrence of this issue. In terms of whether this was dispositional order or not, we would argue that the motion to change custody and guardianship was asking for a modified dispositional order. The statute, both Section 223 and 2-28, talk in terms of permanency orders, I believe, and I think that if this is a modified dispositional order, it also could qualify as a permanency review order and support for that was from the C case of the 4th District where the court ordered that the child be transferred to a residential facility and the court said that was the equivalent of a permanency review order and so that the prohibition in the juvenile court act would apply. And I would just like to say, lastly, that if these parties were not happy that DCFS was retained as a guardian, I believe that that would have been appealable under Rule 304B without a special 304A finding. No one appealed that order. And again, if the court has any questions, I'd be happy to entertain them. Thank you, Ms. Hughes. Thank you ladies and gentlemen. We'll take the matter under advisement.